UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

BILL EAST REALTY COMPANY,        }
                                 }
    Plaintiff,                   }
                                 }
v.                               }   CASE NO. CV 96-B-2097-S
                                 }
FEDERAL RESERVE BANK OF          }
ATLANTA,                         }
                                 }
    Defendant.                   }

## MEMORANDUM OPINION

Currently before the court is the motion of defendant Federal Reserve Bank of Atlanta ("Federal Reserve" or "defendant"), for summary judgment. Upon consideration of the record, the submissions of the parties, the argument of counsel, and the relevant law, the court is of the opinion that defendant's motion is due to be granted.

This lawsuit arises out of the alleged failure by the Federal Reserve to pay plaintiff Bill East Realty Company ("Bill East" or "plaintiff"), a real estate commission. More specifically, plaintiff alleges that defendant committed fraud by misrepresenting that it would pay him a commission upon defendant's purchase of property located by plaintiff. Additionally, plaintiff contends that defendant should pay plaintiff a commission on a quantum meruit basis. The amount of the commission claimed by plaintiff is $359,819.37, which is ten percent of the purchase price of certain property acquired by defendant.

### FACTUAL SUMMARY

Most of the facts surrounding this controversy are undisputed. Bill East Realty Company is a real estate agency operating in the Birmingham area market. The company's sole principal,

William East ("East"), is a licensed broker who has been in the real estate business for over forty years. (East Depo. at 11).

In the 1970s and early 1980s, the Federal Reserve hired East to negotiate the purchase of several parcels of properties, most of which make up the city block where the Federal Reserve's Birmingham Branch headquarters are now located. (East Depo. at 69-70).

Beginning in 1992, the Federal Reserve began discussing internally the possibility of moving its Birmingham headquarters to a new site. The feasibility of such a move was apparently an on-going issue for about three years. (Herr Depo. at 57-59, 62). One of the Federal Reserve's concerns during this time was whether potential sites in which it might be interested would be within the Birmingham city limits. (East Depo. Ex. 9).

At some point, East became aware that the Federal Reserve was considering a possible re-location of the Birmingham headquarters. In 1993 and 1994, there were a number of telephone conversations and two luncheon meetings between East and Federal Reserve employees in Birmingham. East took detailed notes of these conversations. His notes reflect that the Federal Reserve was considering the possibility of re-locating the Birmingham Branch. (East Depo. Ex. 5, 8, 9, 14). Plaintiff's notes and deposition testimony reflect that the Federal Reserve wanted to determine whether the Birmingham city limits included areas of the real estate development on the southern and eastern outskirts of the city. (East Depo. Ex. 5, 9). Additionally, East's notes and deposition testimony reflect that he drove the Federal Reserve employees through these areas of real estate development once in February 1993, and once in February 1994. (East Depo. Ex. 9, 14). East provided the Federal Reserve with a city map and brochures on these developments.

(East Depo. at 106-07). One of the developments was Liberty Park, which borders Interstate 459 on the southeastern edge of Birmingham. (*Id.*)

The last contact plaintiff had with the defendant was on June 9, 1994, when East called Fred Herr, a Federal Reserve official in Birmingham. Although the content of this conversation is disputed, accepting East's version as true, East inquired as to whether he "was still in the picture to work with them." (East Depo. Ex. 16). Herr told East that officials in Atlanta "may require a large professional company," but that the Federal Reserve would "compensate" East for his work on any sites that he had shown them. (East. Depo. Ex. 16). According to his notes, in June 1994, East told Herr that he was "still hoping to work with them." (*Id.*)

East and the Federal Reserve never signed an express real estate agreement. Plaintiff acknowledges that he and the Federal Reserve never negotiated a specific commission rate that would have been payable by the Federal Reserve. (East Depo. at 63, 65-66).

Beginning in February 1995, the Federal Reserve commenced a search for a new location for its Birmingham Branch headquarters. (Def.'s Ex. D). The Federal Reserve hired a Birmingham real estate agency, Johnson-Rast & Hays Company ("JRH"), to assist in the search and acquisition. (Herr Depo. at 71; Def.'s Ex. E at 1). On May 8, 1995, the Federal Reserve and JRH signed a Real Estate Services Agreement. (Def.'s Ex. C). The Federal Reserve agreed to pay JRH five percent of the purchase price up to a certain dollar figure, and then four percent of the purchase price exceeding that figure. The Agreement also provided that JRH initially attempt to secure payment of any commission from the seller of the property. In the event the Federal Reserve used JRH's services only to identify and evaluate property sites, and not for an actual acquisition, the Federal Reserve would pay JRH on an hourly basis. (Def.'s Ex. C at 5-6).

JRH agents collected and submitted to the Federal Reserve information on over fifty sites that would meet the Federal Reserve's requirements. (Def.'s Ex. E). On behalf of the Federal Reserve, JRH negotiated and acquired purchase options on three of the sites. (Def.'s Ex. E). The Federal Reserve decided that the Liberty Park property was the most suitable site, and further negotiations were undertaken. The Federal Reserve and the real estate developer, Torchmark Development Corporation, reached an agreement for the purchase of the Liberty Park property at a price of $3,598,193.74. The purchase was consummated on May 15, 1996. At the closing, the Federal Reserve paid JRH a commission of $101,427, which is approximately 2.82% of the purchase price, and Torchmark paid the remainder of JRH's five percent commission, which totaled $78,481.94. (Herr Depo. Ex. at 5, 6).

There was an approximately two year lapse between plaintiff's last contact with defendant and the May 1996 closing. During this period, plaintiff apparently saw a January 1996 *Birmingham News* article which reported that the Federal Reserve may be purchasing a new site, and that "Johnson-Rast & Hays Co. is assisting in choosing the site." (East Depo. at 56-57, 171-72, East Depo. Ex. 19). Plaintiff, however, did not contact the Federal Reserve to determine what, if any, role he might have in the acquisition. (East Depo. at 58). Immediately following the purchase of the Liberty Park property, plaintiff sent the Federal Reserve a letter dated May 20, 1996, in which he claimed a commission on this transaction. (East Depo. Ex. 22). This lawsuit followed.

It is undisputed that there was never any written contract or other document reflecting that East would be paid a commission. Furthermore, it is also undisputed that no one at the Federal Reserve ever represented orally to East that his company would be paid a ten percent

4

commission on the purchase of property, including Liberty Park. There is no evidence that plaintiff had any involvement in selecting and acquiring the Liberty Park property once this process was actually commenced in early 1995. Nor has there been any showing that the Federal Reserve or JRH actually benefitted from any assistance or information which may have come from plaintiff.

Plaintiff, nevertheless, contends that he "located" the Liberty Park property for the Federal Reserve in 1993 and again in 1994. Therefore, he argues that he is entitled to present both fraud and quantum meruit claims to a jury to for a determination of whether he is owed a real estate commission, and, if so, how much. (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. at 1).

## SUMMARY JUDGMENT STANDARD

Under FED. R. CIV. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23; *see* FED. R. CIV. P. 56(a) and (b). Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. Rule 56 (c) mandates the entry of summary judgment against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.

If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (citations omitted); *accord Spence v. Zimmerman*. 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## DISCUSSION

### Fraud

The parties agree in their briefs that plaintiff's fraud claim is one of promissory fraud under Alabama law. To establish a prima facie case, plaintiff first must present substantial evidence supporting the four basic elements of legal fraud: (1) that the defendant made a false representation; (2) that the false representation related to a material fact; (3) that plaintiff justifiably relied upon the misrepresentation; and (4) that plaintiff suffered damage as a proximate result of the misrepresentation. *See Carter v. Innisfree Hotel, Inc.*, 661 So.2d 1174, 1180 (Ala.

1995); *Pinyan v. Community Bank*, 644 So.2d 919, 923 (Ala. 1994). In addition, plaintiff must prove the following two elements of promissory fraud as well: (5) that at the time of the alleged misrepresentation, defendant did not intend to perform the act promised; and (6) that the defendant intended to deceive plaintiff. *National Sec. Ins. Co. v. Donaldson*, 664 So.2d 871, 876-77 (Ala. 1995); *See also Picker Int'l, Inc. v. Parten*, 935 F.2d 257, 265 (11th Cir. 1991) (applying Alabama law). The failure to perform the promise is not of itself sufficient to support a charge of fraud. *See Cabnetware, Inc. v. Birmingham Saw Works*, 614 So. 2d 1034, 1038 (Ala. 1993).

Plaintiff has not clarified whether the basis for his promissory fraud claim is the "compensation" statement in June 1994, or some earlier representation. Although plaintiff's complaint alleges that the June 1994 statement was fraudulent, in his brief and at oral argument, plaintiff refers to an earlier conversation in which a Federal Reserve employee purportedly told him that the Federal Reserve wanted East to "represent" the Federal Reserve "if they relocated." (Pl.'s Br. at 4; East Depo. at 110-11). At oral argument on defendant's motion, plaintiff's counsel argued that the Federal Reserve's fraudulent commitment to pay East a commission may be implied from these earlier discussions. For purposes of summary judgment, the court will assume that plaintiff is basing his fraud claim on each of these conversations he claims to have had with the Federal Reserve. In the opinion of the court, however, plaintiff still has failed to offer evidence of a specific misrepresentation of fact.

First, with respect to the June 1994 "compensation" statement, in the court's view, this statement does not give rise to the inference that the Federal Reserve would pay East a ten percent commission on a particular piece of property. East's notes and his May 1996 letter to the

7

Federal Reserve show that, by this conversation, East was aware that he might not be asked to select and negotiate a new property site. There was no false statement of fact and certainly no detrimental reliance arising out of this conversation.

Second, assuming that in early 1993 a Federal Reserve employee told plaintiff that the Federal Reserve wanted plaintiff to "represent" the Federal Reserve, this statement alone does not give rise to the inference that the Federal Reserve would pay plaintiff a commission, regardless of which property was chosen, when it was purchased, or how much the Federal Reserve would pay for it. Even accepting as true all inferences favorable to plaintiff, East's own notes and testimony, at best, establish that the Federal Reserve was simply considering retaining East as its agent, if the Federal Reserve ever re-located. These statements or inferences, however, are not substantial evidence of a false promise that the Federal Reserve would hire him or pay him a commission of some amount. *See Hurst v. Nichols Research Corp.*, 621 So. 2d 964, 969 (Ala. 1993) (defendant's statement in letter that stock options would be "considered" is entirely different from oral commitment to provide additional stock).

In his factual showing, plaintiff emphasizes his past relationship with the Federal Reserve, presumably contending that this past relationship made him more susceptible to an implied misrepresentation by the Federal Reserve, and that he would be paid a commission. Plaintiff also presumably contends that there was no need for an agreement on this transaction, because there was no written commission agreement on previous transactions.

Plaintiff admits that the party responsible for paying plaintiff's commission on earlier transactions was negotiated with the seller of the property prior to closing. (East Depo. at 39-40, 44-46, 49-52). He also acknowledges that it is customary for the seller to pay the commission.

8

(East Depo. at 43-44). Plaintiff specifically acknowledges that, as purchaser, the Federal Reserve only paid all or part of plaintiff's commission after plaintiff was unsuccessful in negotiating payment by the seller. (East Depo. at 39-40, 44-46, 49-52).

Plaintiff's experience in these prior transactions weakens his fraud claim. His own notes and testimony reflect that his discussions in 1993 and 1994 concerning representation of the Federal Reserve were, at best, tentative. Indeed, East admits that there was never any oral or written statement about any commission, because he and the Federal Reserve had never reached any "deal." Plaintiff testified, "If I had gotten in a deal with them, and they had stayed in there with me, I would have negotiated [the commission amount]." (East Depo. at 63, 65-66). It is clear that the Federal Reserve had not reached the point during these discussions where it would have specifically represented that the Federal Reserve would pay East a commission.

Given the overwhelming evidence, including plaintiff's own testimony, the court also concludes that plaintiff has not established detrimental reliance, which is an essential element of a fraudulent misrepresentation claim. *See Sherrin v. Northwestern Nat. Life Ins. Co.*, 2 F.3d 373, 378 (11th Cir. 1993) (applying Alabama law). No reasonable jury could infer that plaintiff, particularly with his experience and knowledge of the real estate business, detrimentally relied on such tenuous comments which, even when taken together, lack the most basic terms of a real estate agency agreement.

Even if this court could find a specific misrepresentation upon which plaintiff relied, plaintiff still would have to demonstrate that the Federal Reserve intended to deceive him. Plaintiff argues that the intent to deceive may be inferred from Fred Herr's statement that plaintiff would act as the Federal Reserve's agent, because Mr. Herr was not authorized to select the

9

agent. Plaintiff argues that his realty company was not considered by the Federal Reserve committee which ultimately made this decision. (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. at 7-8).

In the court's opinion, throughout 1993 and 1994, the Federal Reserve employees in Birmingham, including Herr, were not certain whether the Federal Reserve in Atlanta would authorize the Birmingham Branch to re-locate. East's own notes reflect that the discussions of this prospect were always tentative and uncertain. The committee decision referred to by East did not even occur until two years after Herr supposedly engaged East to "represent" the Federal Reserve in February 1993. The decision was still over six months away when Herr told East in June 1994 that East might <u>not</u> be chosen as the agent. Simply stated, there is no significant evidence that the Federal Reserve intended to deceive plaintiff. Although plaintiff may believe he is "entitled" to a commission based upon the fact that he showed the Federal Reserve several property locations, one of which the Federal Reserve purchased three years later, this simply does not translate to fraud. Thus, the court is of the opinion that summary judgment is due on plaintiff's fraud claim.

**Quantum meruit**

The quantum meruit doctrine is typically invoked to avoid unjust enrichment. A quantum meruit claim may be pursued when the plaintiff can show that the defendant received the benefit of plaintiff's work but has not paid for the same. In such cases, it would be proper and equitable to find that an implied contract existed for the payment of such services. *See Burgess Mining and Constr. Corp. v. Lees*, 440 So. 2d 321, 337 (Ala. 1980); *see also U.S. for Use and Benefit of Easter Gulf, Inc. v. Metzger Towing, Inc.*, 910 F.2d 775, 781 (11th Cir. 1990).

Rather than argue that he should be compensated on a reasonable basis for the work and labor he says he expended on behalf of the Federal Reserve, plaintiff contends that the jury should decide whether the Federal Reserve owes him a commission for his services. On three occasions, plaintiff declined to provide evidence that would reflect the value of the time and effort expended on behalf of the Federal Reserve. In his deposition, plaintiff would not say how many hours he spent on this endeavor. (East Depo. at 206-08). In connection with Rule 26 initial disclosures, plaintiff's counsel stated that "$359,189.37 would be the fair value of the plaintiff's services on a quantum meruit basis." (Def. Ex. "F"). Following the initial hearing on the summary judgment motion, the court allowed plaintiff leave to calculate the value of his services. Instead, plaintiff submitted a letter to the court indicating that plaintiff insisted on submitting a percentage commission claim to the jury.

Even if plaintiff could pursue a quantum meruit claim on a percentage basis, plaintiff failed to offer the kind of evidence that a jury could use to determine the amount of the commission. Plaintiff offered no evidence of a standard commission rate, but, instead, testified that the rate "varies" depending upon the transaction. (East Depo. at 48-49). Plaintiff admits that the commission amount is the result of negotiations, and, in this transaction, there never were any negotiations between the plaintiff, the Federal Reserve, or the seller of the property. Plaintiff was not even involved with the actual purchase of the property. Plaintiff simply argues that the jury can determine what the commission rate should be, and that the commission should be paid by the Federal Reserve. This argument only invites the jury to speculate on compensatory damages based on the notion that a realtor who locates a property for the ultimate purchaser is entitled to a commission. Damages may not be based on mere speculation or conjecture but must be based on

11

just and reasonable inferences from the evidence. There is no evidence in this case on which a reasonable jury could conclude that the plaintiff is entitled to any percentage of the purchase price.

Since the quantum meruit doctrine is invoked to avoid unjust enrichment, the court is compelled to note that the Federal Reserve did, in fact, hire the JRH real estate agency. JRH undertook a thorough search and analysis of at least 50 possible properties including the Liberty Park site. On behalf of the Federal Reserve, JRH negotiated purchase options with the sellers of three of these properties, including Liberty Park. The purchase price of the Liberty Park property and the commission due JRH were negotiated among the parties to the transaction, and the Federal Reserve ultimately paid JRH a commission of $101,427. There is no evidence that the Federal Reserve was unjustly enriched because the plaintiff was never involved with JRH in this process, and there was no evidence that JRH or the Federal Reserve actually benefitted from plaintiff's actions. Moreover, plaintiff is certainly not entitled to damages that can be calculated in terms of a percentage commission. Thus, because plaintiff has declined to offer any evidence from which a jury could reasonably assess the value of his services, summary judgment is due on plaintiff's quantum meruit claim.

## CONCLUSION

Based upon the foregoing, the court holds that there is no genuine issue as to any material fact and defendant is entitled to a judgment as a matter of law. Accordingly, an order granting defendant's motion for summary judgment shall be entered contemporaneously herewith.

**DONE** this 30th day of June, 1997.

*Sharon Lovelace Blackburn*
SHARON LOVELACE BLACKBURN
United States District Judge